UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Jerry Wade, Jr.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br>**Defendants.** | CIVIL ACTION NO.  3:20-cv-966 |

**COMPLAINT**

Plaintiff Jerry Wade Jr., ("Wade") ("Plaintiff" or "Wade"), respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

**Introduction**

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon his termination signed a "Letter of Agreement" purporting to release his claims under ADEA. Plaintiff alleges that he was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program. Plaintiff is entitled to keep his

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2. Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly.

## Jurisdiction and Venue

3. This Court has jurisdiction for his ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Wade is a resident of Illinois who was employed by Capital One most recently as

a Compliance Tester.  Plaintiff was an "employee" as defined in the ADEA.

7.      Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8.      Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9.      Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10.     On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11.     Wade was hired by Capital One in 2015 as a Compliance Tester in their US Card Compliance Department.

12.     Wade worked from Capital One's office in Chicago but reported to Capital One managers in West Creek in Goochland County, Virginia.  On the days he did not work at the Capital One West Creek office, Wade worked remotely from home.

13.     During the time frame relevant to this lawsuit, Wade worked for Capital One as a Senior Associate and held the position of "Compliance Tester II" within the "Specialty ICCT Testing Team".

## Performance Management

14. Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15. Capital One informally refers to the five categories as five "buckets."

16. During his employment with Capital One, Wade received strong performance evaluations, including his Year End evaluation in 2017, where he received an overall rating of "Strong".

## Policy to Increase "Involuntary Attrition"

17. Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

18. During the relevant time period, Capital One implemented personnel policies that:

   a. Sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination; and

   b. Prohibited employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy).

19. The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

20. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

21. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job

eliminations (known within Capital One as "restructuring").

22. Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

23. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

24. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

25. At Capital One the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

26. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

27. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages for their managers to meet regarding what fixed percentage of employees were to end up in each of the performance "buckets" applicable to that EC's line of business.

28. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

29. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which

managers they would identify the ultimate target of "involuntary" terminations.

30.	In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

31.	Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

32.	The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

33.	Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

34.	The Requirement that fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

35.	Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

36.	Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

37.	"Our No. 1 principle is to attract really talented people," [Capital One VP of

Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[1]

38. Capital One's effort to higher younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2020. Based on the general age of college graduates between the years of 2017 and 2020, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

## Termination of Wade

39. Although Wade was hired by Capital One in 2015 at age 51, that was before it implemented its policy to increase "involuntary attrition" beginning in 2017.

40. Capital One's termination of Wade did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

41. Performance evaluations were typically done once a year, with results coming out in late January for the prior calendar year's performance. There was also a mid-year performance status in June or July, but it was fairly informal.

42. However, in furtherance of Capital One's policy to use "performance management" to increase "involuntary attrition" rates, the mid-year performance process became as stringent as the year-end one, and managers were also required to meet "distribution" goals during this formerly informal "mid-year" process. So long as each department's "distribution" percentages met the goal established by Capital One executives, the front line managers were

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

given unchecked discretion over their rating assignments and calibrations, even if such discretion went against stated policy.

43. From his hire through 2018, Wade consistently received strong performance evaluations.

44. In 2017, Wade was on leave and out of the office from the end of May until the end of October due to a serious automobile collision.

45. According to Capital One's policy, employees whose performance cannot be observed for a minimum of 180 days in a year should be removed from Year-End calibrations.

46. Despite Wade's limited availability for review during much of 2017, he was still evaluated and "calibrated" (Capital One terminology for its process of comparing performance to other associates) by his supervisor, and he received an overall rating of "Strong" for 2017, which was issued in early 2018.

47. Based upon Wade's previous record of success and accomplishment, it is likely that his 2017 rating would have been even higher had his injury not caused him to miss several months of work.

48. In 2018, Capital One continued to assign Wade to high-priority projects.

49. To Wade's surprise, in October 2018, his supervisor put him on a Coaching Plan shortly after the "mid-year" performance check-in, alleging that Wade was not meeting the expectations of his position.

50. Wade's supervisor fabricated reasons to support placing him on a Coaching Plan, including highly subjective criteria that could not easily be disputed, but was generally devoid of objective metrics. The objective metrics generally showed that Wade was in fact performing his job at a strong or very strong level.

51. Specifically, Wade met all project deadlines and his work product never reflected negatively on his department. Capital One made false claims in his Coaching Plan to the contrary.

52. When meeting with his supervisor, Wade provided her with objective documentation and records showing that he was meeting all expectations. Wade asked for, but never received, any documentation or record from Capital One supporting its justification for putting him on a Coaching Plan.

53. Wade also asked for but was denied accommodations given to other similarly situated employees younger than him. Specifically, following Wade's accident, he requested and was denied accommodations to help him perform the essential functions of his job. Workplace accommodations were given to younger employees. But for Wade's age, his managers at Capital One would have given Wade additional accommodations which could have assisted Wade in completing his Coaching Plan. Despite being unfairly denied such assistance, Wade objectively met the terms of his Coaching Plan.

54. Wade's Coaching Plan was originally set to run from October to December 2018.

55. At the end of the initial Coaching Plan period, Wade was told by his supervisor that he met all expectations listed in the 2018 Coaching Plan and to "keep doing what you're doing".

56. However, despite Wade's supervisor's verbal confirmation of his success, Capital One chose to extend Wade's Coaching Plan for another 30 days.

57. At the end of that extension, despite similar assurances from Wade's supervisor that he was meeting all expectations, the Coaching Plan was again extended for another 30 days.

58. In January 2019, Capital One issued Wade a rating of "Inconsistent" in his 2018

Year-End Review, and subsequently terminated him in early 2019.

59. Capital One's justification for Wade's poor rating, coaching plan and PIP were false.

60. Wade disputes that he was a poor performer.

61. As a Compliance Tester, Wade's performance could be measured by objective criteria.

62. The coaching plan completed by his supervisor claiming that Wade was a poor performer was pretextual and false, and was issued in order to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

63. In addition to Wade, age 55, three of the four oldest employees in Wade's group who were unjustifiably placed in the bottom two performance "buckets," issued Coaching Plans/PIPs and terminated that same year: Jim Green, who Plaintiff believes was around age 60; and Dina Cortez-Melton, age 49 at her termination.

64. Upon information and belief, these older employees targeted by Capital One were also known to be strong performers.

65. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

66. Such policy is an employment termination program under the OWBPA that affects two or more employees.

67. Upon termination of Wade, Defendants provided, and Wade signed, a Letter of Agreement ("Agreement") which provided him severance pay in exchange for waiving certain

claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

68. Upon termination of Wade and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

69. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

## Count 1 – OWBPA

70. OWBPA claims may not be released.

71. ADEA claims may not be released unless they comply with the OWBPA.

72. Capital One's Letter of Agreement did not comply with OWBPA.

73. The policy alleged herein was an "employment termination program" affecting two or more employees.

74. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

75. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

76. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

77. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting

Plaintiff to proceed with his claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

78. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

79. Capital One cannot prove that the Agreement was knowing and voluntary.

## Count 2 – ADEA

80. Capital One discriminated against Wade because of his age, 55.

81. Capital One characterized Wade's termination as an "involuntary" termination based on performance.

82. Capital One provided Wade with a severance in an amount referred to as the "Performance Benefit Structure" which, according to its Associate Severance Plan, applies where "the associate is terminated due to poor performance."

83. The allegation of poor performance was pretextual and false. At the time Wade was originally placed on a coaching plan in 2018, his three previous performance evaluation assigned him a rating of "Strong."

84. The reason given for placing Wade on a Coaching Plan and PIP were pretextual and false. Wade was verbally told that he successfully completed his Coaching Plan.

85. The reasons noted for Wade's termination (i.e. poor performance) were pretextual and false.

86. Between 2018 and 2019, three of the four oldest employees in Wade's group, Wade, Dina Cortez-Melton, and Jim Green, were issued Coaching Plans and/or PIPs, and terminated for alleged poor performance.

87. Upon information and belief, these individuals also had strong records of performance prior to being issued a Coaching Plan and/or PIP.

88. But for Wade's age, he would not have been placed on a "coaching plan," nor denied accommodations, nor selected for PIP or termination.

89. Capital One disparately treated Plaintiff and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

90. Capital One's disparate treatment of Plaintiff and older employees was willful.

91. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

92. Plaintiff was disparately impacted because of his age by Capital One's policies which resulted in his termination.

93. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

### Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

A. Issuance of an Order finding that Capital One did not comply with the OWBPA;

    B.    Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

    C.    Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with his ADEA claim;

    D.    An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

    E.    An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who received a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

    F.    attorneys' fees; and

    G.    any and all further relief permissible by law.

## ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

    A.    Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

    B.    money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and the difference in severance benefits between Capital One's "Performance Benefit Structure"

which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  C. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations of the ADEA;

  D. pre-judgment and post-judgment interest;

  E. reasonable attorney's fees and costs expended in the prosecution of this case;

  F. any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

        Respectfully submitted,
        **Jerry Wade, Jr.**
        Plaintiff

        By:\_\_\_\_/s/_____
        Craig Juraj Curwood (VSB No. 43975)
        Curwood Law Firm, PLC
        530 E. Main Street, Suite 710
        Richmond, VA 23219
        Telephone: (804) 788-0808
        Fax: (804) 767-6777
        ccurwood@curwoodlaw.com

        and

        Harris D. Butler, III (VSB No. 26483)
        Paul M. Falabella (VSB No. 81199)
        BUTLER ROYALS, PLC
        140 Virginia Street, Suite 302
        Richmond, Virginia 23219
        Telephone: (804) 648-4848
        Facsimile: (804) 237-0413
        harris.butler@butlerroyals.com
        paul.falabella@butlerroyals.com
        *Attorneys for Plaintiff*